Appeal of the New Brighton & New Castle Railroad Company.

The New Brighton & New Castle Railroad Company *versus* The Pittsburgh, Youngstown & Chicago Railroad Company.

1. Corporations chartered under the Act of April 4, 1868 (Purd. Dig., 1211), are, by the fifth section thereof, entitled to the powers and privileges, and subject to the restrictions of the Act of Feb. 19, 1849 (Purd. Dig., 1214). Under the latter Act, surveying, locating and designating, by proper marks, the property to be taken for railroad purposes, cannot be done by the projectors of a railroad company before its incorporation, but only by the president and directors of a duly incorporated company, their engineers and employees.

2. An unauthorized preliminary survey, though well marked by a line of stakes indicating the location of a railroad, cannot be regarded as sufficient notice of a prior legal appropriation of the land.

3. Where a railroad company, incorporated under the said Act of April 4, 1868, by mere resolution adopted a survey and location of a line, made before said company was chartered, by parties who, being unincorporated, had no legal authority to make such location or construct a railroad, though this location was made by said parties as projectors of the future organization: *Held*, that such survey and the subsequent adoption thereof by the company, after its incorporation, did not give it any right to the location as against another company, chartered under said Act, which subsequently not only adopted a similar survey and location covering part of the same ground, but also took actual possession thereof, by retracing and marking the line as its own, before the first mentioned company had done anything more than pass and enter on its minutes the resolution of adoption.

4. An appeal duly taken from a final decree in equity, with approved security, in accordance with the order of Court, in connection with the removal of the record to the Supreme Court, operates as a supersedeas, or stay of proceedings to enforce the decree; but the Court below nevertheless retains the right (concurrently with the Supreme Court) to control the actions of the respective parties, in so far as to preserve the *status in quo* of each, as it was at the time the decree was made; and for this purpose, if necessary, to issue an attachment.

5. It is well settled that, as a general rule, a writ of attachment authorizing the summary arrest and imprisonment of parties, cannot issue without such previous notice as will afford them an opportunity of being heard. While it is true that cases of extraordinary emergency may arise in which a strict observance of this rule would defeat the ends of justice, yet *held*, that the record in this case disclosed no such pressing necessity as to warrant a departure from the general rule.

January 8th, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

[New Brighton, &c., R. R. Co. *v.* The Pittsburgh, &c., R. R. Co.]

APPEAL from the Court of Common Pleas of *Lawrence county:* In Equity: Of October Term, 1883, No. 217. Also CERTIORARI to said Court: Of October Term, 1884, No. 15.

These two cases were argued together. The first was a bill in equity filed by The Pittsburgh, Youngstown & Chicago Railroad Company, plaintiffs, against the New Brighton & New Castle Railroad Company, defendants, praying that the defendant company might be restrained from taking possession of a certain surveyed line for a railroad, which was claimed by the plaintiffs, and from delaying the plaintiffs in the completion of their road thereon.

The contest was between the two railroad companies for the possession of the same surveyed line for their respective roads, both claiming a prior location and taking.

After answer filed, and reference to a master, the Court, McJUNKIN, P. J., presiding, entered a decree enjoining the defendant company according to the prayer in the bill, except that said company was granted permission to construct a bridge for its tracks across a certain point in the line claimed by the plaintiffs.

From this decree the defendants appealed. The facts as found by the master, J. McMichael, Esquire, are fully stated in the opinion of this court.

The certiorari, to October Term, 1884, was specially allowed to bring up the record of certain proceedings by writ of attachment against the officers and workmen of the New Brighton and New Castle Company, issued by the court below after the said appeal was taken.

The facts in this case and the questions presented by the assignments of error, are also fully stated in the opinion of this court thereon.

*Oscar L. Jackson* (with whom were *Hampton* and *Dalzell*), for the appellants in both cases.

1. Staking a centre line is sufficient to determine a location, but it must be done by a company in its corporate capacity, and not by private individuals who afterwards become corporators. Titusville & P. R. R. Co. *v.* Warren & V. R. R. Co., 12 Phila., 642. If a company by resolution adopts a private road for its line, but does no act of re-surveying or re-locating, it does not amount to a location. McCandless' Appeal, 20 P. F. S., 210. Passing resolutions does not amount to a location. Baldwin *v.* Hillsborough R. R. Co., 10 West. Law Jour., 356.

2. The court below made an order that upon giving bonds in a certain sum, with sureties to be approved by the court, the appellant's appeal should operate as a supersedeas. This requirement was fully complied with, and the attachment was

[New Brighton, &c., R. R. Co. *v.* The Pittsburgh, &c., R. R. Co.]

in plain violation of said order. Slaughter-house Cases, 16 Wallace, 36; Hedge's Appeal, 13 P. F. S., 273. Again, the attachment cannot be sustained because it was granted ex parte, and without a hearing. Ex parte Langdon, 25 Vt., 680; Hurd on Habeas Corpus, p. 407.

*Thomas W. Sanderson* and *D. B. & E. L. Kurtz*, for the appellees in both cases.

1. Marking out a certain line by sufficient and proper stakes is a sufficient location to prevail against a second company subsequently seeking to occupy the same ground. Wilkesbarre & Phila. R. R. Co. *v.* Danville H. & W. R. R. Co., 29 Leg. Int., 373; Titusville & P. C. R. R. Co. *v.* Warren & V. R. R. Co., 12 Phila., 642. This and much more was done by the appellees, and full notice of the same given to the appellants before the latter made their pretended location. It is of no importance that the survey was made before the incorporation of the appellees, since it was made in their behalf, and then adopted by them immediately upon their organization. Morris & Essex R. R. Co. *v.* Blair, 1 Stockton, N. J. Eq., 643.

2. Neither an appeal nor a certiorari operates as a supersedeas so as to vacate a decree of the court below, and permit a party to continue to perform wrongful acts which he was enjoined from performing by said decree. French *v.* Shoemaker, 12 Wallace, 86; Whitney *v.* Mowry, 3 Fisher's Patent Cases, 161. In chancery it is a matter within the discretion of the court to issue an attachment without a personal service of notice therefor. Robb *v.* Pepper, 11 W. N. C., 497.

Mr. Justice STERRETT delivered the opinions of the court in both cases, February 25th, 1884.

## APPEAL, No. 217, OCTOBER TERM, 1883.

For the purposes of this case it may be assumed that each of the companies litigant is authorized by its charter to locate, construct and operate a railroad along the Big Beaver river between certain points in the counties of Beaver and Lawrence. In the proper exercise of that right, as they claim, the companies each surveyed, marked and determined the location of their respective roads, but the locations thus ascertained and determined by them respectively so interfere with each other, that at certain points they are substantially identical, and at other points they are partially the same. Hence arises the vital question in the case: Which of the companies acquired the prior, and, consequently, the better right of location at the points of interference? The proper solu-

tion of this question necessarily depends upon what was done by each company under its charter, and in accordance with the law relating to the location and construction of railroads. . The learned master's findings of fact are fully and clearly stated in his report, and in no essential particular is their correctness seriously questioned. The contention is as to their application to the law under which the companies were incorporated, and the legal conclusions drawn therefrom. In so far as they are material to the question involved, the facts found by the master are substantially as follows: The New Brighton and New Castle Railroad Company, appellant, was duly incorporated March 24, 1881, under the Act of 1868 and its supplements, to construct, maintain and operate a railroad from New Brighton, in Beaver county, to New Castle, in Lawrence county. An organization was immediately effected, and at a meeting of the directors, March 30, 1881, the map of a survey made by Mr. Slataper, chief engineer of the Pennsylvania Company in 1875-6, was presented, and a resolution adopted " That the location of this company's line of road, as shown by the map now presented, be and the same is hereby adopted, and the president is instructed to take such steps as may be necessary to secure such location." The survey referred to was made under the direction of the Pennsylvania Company, then and still operating the Pittsburgh, Fort Wayne and Chicago Railway, and other railroads over which it had a continuous line from Pittsburgh through New Brighton and New Castle, and thence northerly to Lake Erie. In the spring of 1873 the engineers of that company made a preliminary or experimental survey from New Castle to New Brighton, marked the same " by a line of stakes one hundred feet apart in most places, with stakes at all angles, as is customary in such surveys." A report of the survey with map of the line was made to the company, and in August, 1873, the map, recorded in Beaver and Lawrence counties, was filed in the engineer's office of the company. In 1875-6 the survey of 1873 was revised, and such changes made as were necessary to adapt it to the ground, equalize the cutting and filling, and definitely locate a road with a view to its immediate construction. The curves were all determined, levels and cross sections taken, estimates made, and all the work on the ground marked by stakes in the usual way. The line thus re-located, mainly on the now disputed territory, together with a map of the same, was reported to the Pennsylvania Company; but, aside from the fact that the survey was made under the direction of that company, and with the view to the immediate construction of a railroad, it did not appear who or what company intended to construct the proposed road, nor was it

shown that any person or corporation was authorized to make the survey or construct the road.

In pursuance of the resolution above quoted, the appellant company proceeded to make a re-survey of the line therein mentioned, and on April 11, 1881, its engineers commenced work on the east side of the Beaver river, north of Chewton, and proceeding southward they "reproduced on the ground" the line run in 1875–6, marking it anew in the usual way. Within a week from that date they had re-surveyed and marked the line between Chewton and the mouth of the Connoquennessing creek, embracing the ground in dispute, and by the latter part of the month they had reached the southern terminus of the line at or near New Brighton. The retracing and marking of this line in the manner above stated was the first work done on the ground after the incorporation of either of the contending companies.

While the re-survey was in progress the president of the Pittsburgh, Youngstown and Chicago Railroad Company, appellee, was informed of the fact; but not being then advised of the incorporation of appellant company, he supposed the survey was being made at the instance of the Pennsylvania Company, and accordingly notified certain of its officers that the company he represented "had located its proposed railroad from Pittsburgh to the Ohio state line, partly along and near to the Big Beaver river, on the east side of the said river, or on the opposite side from the town of Beaver Falls," and warned them not to interfere therewith, etc. On April 29, 1881, the same notice was given in writing to the engineer in charge of the corps then retracing the line for appellant company at Beaver Falls, and by him delivered to the chief engineer of the company. The appellant company disregarded the notice, and, holding possession of the location it claimed to have made, proceeded to construct its road, and was so engaged when the bill was filed by appellee in July, 1882.

The Pittsburgh, Youngstown and Chicago Railroad Company, the appellee, was duly incorporated in December, 1880, under the Act of 1868 and its supplements, with authority to construct and operate a railroad from Pittsburgh down the Monongahela and Ohio rivers to a point at or near the mouth of the Big Beaver river, thence up the same to a point near the junction of the Mahoning river, thence up the Mahoning to the Ohio state line. Prior to the incorporation of the company, its projectors, with the view of procuring a charter and building a railroad on the route afterwards designated in the charter, employed Mr. Cooper, an experienced engineer, to make a survey. Commencing in April, 1880, he surveyed

9 OUTERBRIDGE.—2.

and marked a line from Pittsburgh to the mouth of the Big Beaver, and also from Moravia, in Lawrence county, down the east side of the Big Beaver river to its mouth. The survey along the river, covering those portions of the location now in controversy, was well marked by stakes, set in the usual manner, designating stations or distances of one hundred feet each. The angles were also designated by stakes, and the entire survey, though hastily made, was so marked as to indicate a railroad location of the usual width. In making the survey a few old stakes were found at long intervals, but nothing sufficient to show a previously located line for a railroad. A report of the survey, with the notes thereof, was made to the projectors of the appellee company, who shortly thereafter formed an association and obtained a charter as above stated. An organization was thereupon effected, and at a meeting of the directors, February 15, 1881, the map of the survey made by Mr. Cooper in April 1880, was presented, and the following resolutions adopted:

1st. " That the line for a railroad surveyed from Pittsburgh to the east line of the State of Ohio, at the instance of the corporators of the Pittsburgh, Youngstown and Chicago Railroad Company by C. A. Cooper, and by him staked out and marked on the ground by a line of stakes indicating the centre line of a way sixty feet wide, where practicable, and duly reported by said Cooper to this board, be and the same is hereby adopted as the location of the railroad of this company."

2d. " That the president be and he is hereby authorized and empowered to cause such additional surveys on and along such said located line to be made as he may deem necessary before beginning the actual procurement or purchase of rights of way for said railroad, and the actual construction of said line of railroad, and to pay for said surveying and engineering out of any moneys of the company."

No work of any kind was done upon the ground by the appellee company until May 10, 1881, when a re-survey of the line, run by Cooper in April 1880, was commenced for the purpose of fitting in curves and preparing for construction. In making the re-survey the engineers proceeded from Moravia down the Beaver river over the ground in dispute; and for the purpose of better adjusting the line to the ground they made some changes, but not at those points where the locations of the contending companies interfere. At that time the line of Cooper's original survey was easily retraced by the aid of stakes still standing, and on appellant company's line the stakes set about a month before were also distinctly visible.

[New Brighton, &c., R. R. Co. v. The Pittsburgh, &c., R. R. Co.]

It thus appears that the first act of each company, looking to the location of its line, was the adoption, by mere resolution, of a survey and location made before either of them came into existence, by parties who, respectively, had no authority to survey, locate or construct a railroad on the route in question. The first location actually made on the ground, after the incorporation of either company, was that made by appellant, as above stated.

It is too clear for argument that neither of the surveys thus made prior to the incorporation of either company by parties having no authority to locate or construct a railroad on the route in question could, in and of themselves, confer any right to the location in dispute. If either of them became in any manner effective, as the foundation of a right to the location, it must have been by virtue of its adoption and appropriation by one of the contending companies to its own purposes. This brings us to the consideration of the question whether the adoption, by resolution merely, of a previous unauthorized survey and location, gives the company adopting it any right thereto as against another company which, subsequently, not only adopts a similar survey and location, covering part of the same ground, but also takes actual possession, re-traces and marks the line as its own before the other company has done anything more than pass and enter on its minutes the resolution of adoption. It is contended, on behalf of appellant company, that it does not; that the naked adoption of the location in question by the appellee, without being followed by actual possession in some form before the ground was occupied by appellant, gave the former company no right as against the latter; and in support of this proposition our Act of Assembly relating to the survey and location of railroads is relied on.

The parties to this contention were invested with certain rights, powers and privileges necessary to the accomplishment of the purposes for which they were respectively incorporated. They could exercise only such powers as were given to them in express terms or by necessary implication; all others were withheld. As to what they could do, and the manner in which it could be done, they were necessarily governed by the law under which they were created. The Act of 1868, prescribing the manner in which such companies may be incorporated, requires the corporators to sign articles of association, setting forth, inter alia, "the places from and to which the road is to be constructed or maintained and operated, the length of such road as near as may be, and the name of each county in the state, through or into which it is made or intended to be made." These articles of association, upon being filed in the office of the Secretary of the Commonwealth, become the charter

of the company; and, by the fifth section of the Act it is provided that corporations so formed shall be entitled to exercise all the rights, powers and privileges, and be subject to all the restrictions and liabilities of the Act of February, 1849.   That Act provides that "the president and directors of such company shall have power and authority, by themselves, their engineers, superintendents, agents, artisans and workmen, to survey, ascertain, locate, fix, mark and determine such route for a railroad as they may deem expedient," etc., . . . . . "and, in like manner, by themselves or other persons by them appointed, or employees, as aforesaid, to enter upon or into and occupy all land on which the said railroad, or depots," etc., may be located.

The provisions of the Act are clear and explicit.   Every railroad company, incorporated thereunder, is created for a purpose that is essentially public; and to that end, it is clothed with the right of eminent domain, which is never delegated by the Commonwealth to unincorporated associations or private individuals.   It is expressly authorized to survey, mark and determine the route of its road, between the points designated in its charter, and to enter upon and occupy all lands on which its road may be so located, subject however to the constitutional obligation of making compensation for property taken or injured.   In thus exercising the right of appropriating to public use the lands of private individuals, it is necessary in the first place, to survey, locate and designate by appropriate marks the property to be taken.   It was undoubtedly intended that these essential acts upon the ground should be performed, not by the projectors of a railroad company before its incorporation, nor by any one not authorized by the Legislature to do so, but only by the president and directors of a duly incorporated company, their engineers and employees.   Indeed, the Act expressly authorizes them to do so, but it is silent as to the right of all others.   No such thing as a wholesale adoption by mere resolution, of an unauthorized preliminary survey and location appears to have been contemplated.   Doubtless a preliminary survey, made at the instance of persons contemplating the procurement of a charter, greatly facilitates the work of the corporation, afterwards created, in making its location, and designating the same by marks on the ground; and there can be no impropriety in the corporation resolving to adopt such preliminary survey, but that alone, without more, will not secure to it the right of location as against another company that goes upon the ground, surveys, marks, and actually appropriates the proposed location.   The unauthorized preliminary survey, though well marked by a line of stakes indicating the location of a railroad, cannot be regarded as

sufficient notice of a prior legal appropriation of the land. The marks upon the ground would of course suggest the purpose for which they were made, and thus impose the duty of inquiring when and by whom they were placed there. but the due prosecution of that inquiry would disclose the fact that the survey was made by persons who had no authority to locate and construct a railroad on that route, and before any company was incorporated for the purpose. There the duty of inquiry would end, and the company first on the ground would have an undoubted right to consider it unoccupied for railroad purposes, and to proceed with its survey and location. The facts of the case before us serve as an apt illustration of the construction which we think should be given to the Act. The appellant company was the first to go upon the ground in controversy, and there, by actual survey and appropriate marks, fix and determine the location of the road it was authorized to build. All this was done before actual notice was given by the appellee that its line had been located partly on the same ground. The only constructive notice appellant had was that a survey and location had been made without authority from the Commonwealth and before either company was incorporated. That was no notice, either to appellant or land owners, that the location had been previously appropriated by authority of law. It follows therefore that the general conclusion, drawn by the learned court from the facts found by the master, was erroneous.

What has been said in relation to the prior right of appellant company, applies to every part of its location in controversy, except that portion thereof where its line crosses appellee's railroad at Chewton, in Lawrence county. As to it, the learned master found that appellee made the first location, and hence it has a right to construct and operate its road there without unnecessary interference on the part of appellant company. Without referring specially to his findings of fact, as to when and how the respective locations at that point were made, it is sufficient to say they were fully warranted by the evidence, and the conclusion drawn therefrom is correct. He also finds that the difference between the grades of the two roads, at the crossing, is such that appellant company's road may be carried over the other by a bridge not less than nineteen and a half feet, in the clear, above appellee's road, and that appellant should be required to construct and maintain, at its own cost, a bridge of that height.

It follows therefore that so much of the decree as relates to the location at the crossing referred to, and the manner in which appellant company may be permitted to cross appellee's

[New Brighton, &c., R. R. Co. *v.* The Pittsburgh, &c., R. R. Co.]

road at that point should be affirmed, and the residue of the decree reversed.

> So much of the decree of the Court of Common Pleas of Lawrence county as relates to the place where the railroads of the respective companies, appellant and appellee, cross each other at Chewton, in said county, and the terms and conditions on which appellant company is permitted to cross the railroad of appellee by a bridge at that point, is affirmed, and the residue of said decree is reversed and set aside; and it is further adjudged and decreed that each party pay one half of the costs, including costs of this appeal.

### CERTIORARI, No. 15, OCTOBER TERM, 1884.

This certiorari was specially allowed for the purpose of bringing up the record of the proceedings by writ of attachment, against the officers and workmen of the New Brighton and New Castle Railroad Company, issued by the court below after the appeal, which has just been disposed of at No. 217, October, term, 1883 of this court, was taken.

The circumstances under which the attachment was issued are briefly these: On September 24, 1883, the day the decree was entered, the court below, on application of the company, defendant therein, made an order, " that the defendant, if an appeal be taken, shall, to make said appeal a supersedeas, give recognizance to be approved by the court or a judge at chambers in the sum of $5000 conditioned as in writs of error in cases of ejectment, (Purd. 605 note), and according to law." Within a week thereafter, the company complied with the order, gave the required recognizance with sureties approved by the president judge, and in due form appealed from said decree. The record was brought up and filed in this court October 10, 1883. About two weeks thereafter, the Pittsburgh, Youngstown & Chicago Railroad Company, plaintiff below, applied to the president judge of the Common Pleas at chambers for the writ of attachment, which was accordingly issued, commanding the sheriff to attach the bodies, not only of the nine persons therein named, viz: the president, directors, engineer, supervisor, and foreman, but also the bodies of "all employees and workmen of the New Brighton & New Castle Railroad Company, who may be disobeying the decree, order and injunction, or who have heretofore disobeyed said decree" of September 24, 1883, " to answer for an alleged contempt in not obeying and observing said decree," etc. How the sheriff

[New Brighton, &c., R. R. Co. v. The Pittsburgh, &c., R. R. Co.]

was expected to determine who of the company's employees and workmen were then disobeying the decree or had theretofore disobeyed it, does not appear; but, as appears by his return, the sheriff, armed with the sweeping mandate of the court, arrested three of the nine persons named therein and forty-five others and had them in custody the next day.   On the following day the persons thus arrested were brought before one of the associate judges on a writ of *habeas corpus ;* and, on giving recognizance to appear and abide the order of court in the premises, they were discharged.   The company appellant thereupon moved to quash the attachment, but after argument the motion was denied.   This appeal was then taken, and the certiorari, with an order staying all proceedings in the court below was specially allowed.

The orders of court, awarding the writ of attachment and afterwards denying the motion to quash the same, are assigned for error.

It is contended that the appeal, duly taken from the final decree in equity, with approved security in accordance with the order of court, in connection with the removal of the record to this court, operated as a supersedeas of all further proceedings in the court below, pending the appeal, and hence the court had no power to entertain the application for an attachment; that, aside from this, and assuming the court had jurisdiction, the attachment cannot be sustained because it was issued on an ex-parte application, without notice to the parties against whom it was directed and without giving them an opportunity of being heard.

It cannot be seriously questioned that the appeal above referred to was so taken as to make it a supersedeas of all proceedings for the enforcement of the decree thus appealed from, or in the language of the Act of March 17, 1845, "a stay or supersedeas of execution."   Purd. 600, pl. 61.   The provisions of that Act, regulating appeals in equity from the Common Pleas of Philadelphia, were subsequently extended to all the courts of Common Pleas in the Commonwealth by the Act of February 14, 1857, which provides that such appeals may be taken in the same manner and upon the same terms and conditions as are provided in cases of appeal from the Common Pleas or District Court of the city and county of Philadelphia.   Purd. 592, pl. 8.   One of the terms and conditions specified in the Act of 1845 is, that "if the decree or order direct the sale or delivery of the possession of any real property, the issuing and execution of process to enforce the same shall not be stayed," until security be given as therein provided.   Neither the form nor sufficiency of the security given in this case pursuant to the order of court is questioned.

The object of the order was to make the appeal a supersedeas, and we have no doubt it was effectual for that purpose; but, while the appeal was so taken as to make it a stay of all proceedings for the enforcement of the decree, it by no means follows that the authority of the court below, in other matters that might arise pending the appeal, was either superseded or suspended. The purpose of staying proceedings was not to oust the jurisdiction of the court below, but to preserve the status of the respective companies as it was before and at the date of the decree. So far as they were then respectively in actual possession of portions of the disputed location, exercising acts of ownership thereon, they each, as against the other, had a right to continue in the undisturbed enjoyment thereof until the appeal was determined. To that end it is necessary that the power to preserve and maintain the status in quo of parties litigant should be lodged where it can be conveniently exercised. It is conceded that this court is invested with the necessary authority for that purpose, but it does not follow that the same power cannot be rightly exercised by the court from whose decree the appeal has been taken. Indeed there is no valid reason why that court should not possess concurrent authority in the premises. On the contrary there are good reasons why it should. The right of recourse to it for such purposes greatly subserves in most cases, the convenience of the parties; and when this court is not in session, as is the case several months in succession, it affords the only available mode of redress then accessible to parties aggrieved.

It follows from what has been said, that for certain purposes, not involving the enforcement of the decree, the power of the court below was not suspended. Pending the appeal, which operated as a stay of proceedings to enforce the terms of the decree, the court had a right to control the action of the respective parties so far, at least, as to preserve the status in quo of each in relation to the possession of the disputed location; but in doing so, the recognized rules of practice should have been observed. As a general rule it is well settled that a writ of attachment authorizing the summary arrest and imprisonment of parties, cannot issue without such previous notice as will afford them an opportunity of being heard. It is contrary to the general principles of judicial procedure that any one should be condemned without a hearing. Cases of extraordinary emergency, however, may sometimes arise, in which a strict observance of the rule would defeat the ends of justice and might lead to deplorable consequences. Such exceptional cases are very rare; but when they do occur and satisfactory cause is shown, the court may, in the exercise of a sound discretion, dispense with notice and forthwith award an

[Wolf v. The City of Philadelphia.]

attachment.   The record in this case discloses no such pressing necessity as warranted a departure from the general rule.   On the contrary the affidavits on which the writ was issued clearly show that no such extraordinary emergency had arisen.   We are therefore of opinion that the court erred in issuing the writ without previous notice to appellant and the persons named therein.

> The order of court awarding the writ of attachment is reversed, and all proceedings thereunder set aside, at the costs of the appellee.